**PITRE BROS. TRANSFER, INC.,** Southeastern Motor Freight, Inc., Ozone Motor Lines, Inc., and Saia Motor Freight Line, Inc., Petitioners,

v.

**The UNITED STATES of America and the Interstate Commerce Commission,** Respondents.

No. 77–1477.

United States Court of Appeals, Fifth Circuit.

Sept. 13, 1978.

Philip Robinson, Timothy Mashburn, Mert Starnes, Austin, Tex., for petitioners.

John H. Shenefield, Asst. Atty. Gen., Dept. of Justice, John J. Powers, III, Asst. Chief, Daniel J. Conway, Atty., Mark L. Evans, Gen. Counsel, ICC, Frederick W. Read, III, Assoc. Gen. Counsel, Griffin B. Bell, U. S. Atty. Gen., U. S. Dept. of Justice, Alan J. Thieman, Atty., Washington, D. C., for respondents.

Wm. O. Turney, Drew L. Carraway, Washington, D. C., for England Trans. Co., Inc. & Roadway Express.

Ralph W. Pulley, Jr., Dallas, Tex., for Strickland Trans. Co.

Before WISDOM, THORNBERRY and RUBIN, Circuit Judges.

THORNBERRY, Circuit Judge:

This case comes to us on petition for review of a final order of the Interstate

Commerce Commission, Division 3, granting Roadway Express, Inc. and Strickland Transportation Co., Inc. authority to purchase various operating rights of England Transportation Co., Inc.

England Transportation holds Certificate of Public Convenience and Necessity No. MC 57946 Sub 2. The certificate grants England both regular route authority and irregular route authority.[1] By joint application, Roadway Express and Strickland seek permission under Section 5 of the Interstate Commerce Act to purchase portions of the operating authority given by the England certificate. In essence, Roadway seeks to purchase England's irregular route authority in coastal Louisiana while Strickland wants to purchase England's regular authority between New Orleans and Monroe, Louisiana, as well as England's irregular route authority in eastern Louisiana. England would retain irregular route authority in western Louisiana as well as the right to serve New Orleans.

The meaning of a provision in England's operating certificate is the bone of contention in the present case. After describing the regular route authority the certificate contains the following provision:

> The authority granted above shall not be severable by sale or otherwise from the underlying irregular-route authority authorized herein.

The certificate then proceeds to describe England's irregular route authority.

The petitioners in this action, Pitre Brothers Transfer, Southeastern Motor Freight, and Saia Motor Freight Lines, Inc., opposed the granting of the purchase authority to Roadway and Strickland. Throughout this entire proceeding the petitioners have argued that the provision cited above prohibits the division of the regular route authority from the irregular route authority. Roadway, Strickland, and England have consistently argued that the phrase "underlying irregular-route authority" prohibits only the sale of the irregular route authority that physically underlies the regular route, i. e., the highway from New Orleans to Monroe.

A hearing on the applications was held before an administrative law judge and in his decision issued on November 18, 1974, he agreed with the petitioners that the nonseverability provision prohibited the proposed sale. The ALJ held,

> Interpretation of the phrase "underlying irregular-route authority" should not be limited to the specific points lying directly on the regular route.[2]

The ALJ also held that the proposed sale was barred because the proposed division was not along clear-cut boundaries.

The applicants filed exceptions to the ALJ's decision with Division 3 of the Interstate Commerce Commission. By its report, Division 3 held that the proposed division of authority was along clear-cut geographic lines. However, Division 3 denied the applications because unusual circumstances resulted in an improper duplication of services. The Commission's report is found at 122 M.C.C. 223, 228, 229 (1975). We have reproduced in the margin Division 3's discussion and conclusion.[3] It is important to note that the Commission never addressed the petitioner's main argument that the

---

1. As we said in *North Alabama Express, Inc. v. United States,* 576 F.2d 679, 681 n. 1 (5 Cir. 1978),

   "regular route" authority means the authority to carry goods in a scheduled operation over a restricted and defined route; "irregular route" authority means the authority to carry goods in an unscheduled operation within a restricted territory but wholly unrestricted as to route.

2. No. MC F 11991, Initial Decision, p. 14.

3. DISCUSSION AND CONCLUSIONS

   In our view, the proposed division of authority is along reasonably clear-cut, geo-

*terms* of the certificate prohibited the division.

The applicants then asked the Commission to reconsider its decision. On reconsideration, Division 3 determined that the proposed transfer was in the public interest and approved the proposed sale. The Commission's report is found at 122 M.C.C. 431 (1976). In its report the Commission stated:

graphic lines. The transaction would enable one of the three applicants to serve points on the boundaries between the irregular-route territories sought to be acquired and another to serve points inside the boundaries. This would result in some duplication of service within portions of the commercial zones of boundary points and, therefore, result in the rendition of service at points within the area of duplication by two carriers where only one could previously provide service. It is the creation of this situation that the nonseverability condition is intended to preclude. However, the duplication involved here results from operation of law and is confined merely to portions of the commercial zones of boundary points. Under normal circumstances, this duplication would not appear to warrant denial of the authority sought. Compare *Vinci's Exp., Inc.—Purchase—B. Clayman & Sons,* 57 M.C.C. 434. Here, however, the circumstances are not in our view, normal.

A portion of the boundary between the irregular-route rights sought to be acquired by vendees lies between Baton Rouge and New Orleans. It follows, for the most part, the Mississippi River. For a minor portion of the distance, the boundary is the river itself. There appear to be few crossings over the river between Baton Rouge and New Orleans, either by ferry or by bridge. It is likely that the river serves as a natural, geographic limitation upon the rendition of irregular-route service between points on one side, on the one hand, and, on the other, points on the other side. Thus, approval of the proposed transactions would enable Roadway to conduct what would likely be two separate and distinct irregular-route operations between Baton Rouge and New Orleans: one between New Orleans and points within 10 miles thereof, on the one hand, and, on the other, points on and between the boundary and the Mississippi River, and another between New Orleans, and points within 10 miles thereof, on the one hand, and, on the other, points west of the Mississippi River.

The river appears to be located only 3 to 15 miles from the regular route between Baton Rouge and New Orleans. As a result, any operation by Roadway between New Orleans, on the one hand, and, on the other, points on and between the boundary and the river, would be severely restricted, not only by the physical barrier posed by the river, but by the small amount of territory Road-

way would be able to serve north and east of the river. It is doubtful, we believe, whether such a restricted operation would be feasible. Clearly, operations in such a limited area would be more feasible if conducted in conjunction with the irregular-route authority sought to be acquired by Strickland.

Very little traffic has moved between New Orleans, and points within 10 miles thereof, on the one hand, and, on the other, points on and between the boundary and the river between Baton Rouge and New Orleans. In fact, the rights to operate between such points may well be dormant. However, the territory involved is not sufficiently significant, when viewed in relation to the rest of the territory involved in Roadway's proposal, to warrant a finding that such rights are dormant. We can ascertain no logical or practical reason for the proposed division of the rights in the manner proposed between Baton Rouge and New Orleans. Strickland already holds regular-route authority to operate between these points and it may be applicants' intention to substitute Roadway's service for that provided by vendor and, thereby, retain the two-carrier status now in effect. However, this would require the acquisition by Roadway of authority greater in territorial scope than it proposes to purchase.

In view of the unusual circumstances described above, which surround the proposed division of vendor's irregular-route authority between Baton Rouge and New Orleans, we must conclude that the duplication of service that will result at points within portions of the commercial zones of boundary points between Baton Rouge and New Orleans, contradicts the purpose of the nonseverability condition found in vendor's authority; that that portion of vendor's irregular-route authority, authorizing operations at points on and between the proposed boundary and the Mississippi River between Baton Rouge and New Orleans, underlies the vendor's regular route between Baton Rouge and New Orleans; and that the applications should be denied.

The restriction proposed by Roadway, though possible remedying the improper severance of the two types of authority between Gramercy and New Orleans, would not apply between Baton Rouge and Gramercy and, therefore, would not remedy the improper severance of such authority between these points.

Inasmuch as the petitions for reconsideration and the replies thereto are addressed principally to the matter regarding the duplication of services, vis-a-vis the condition against severability, we will initially consider the nonseverability issue, before turning to a discussion of the other issues upon which the Administrative Law Judge made findings in the initial decision.

122 M.C.C. 440.

After announcing its intention to address the petitioners' main argument, the Commission utterly failed to discuss why the phrase "underlying irregular-route authority authorized herein" refers only to the land actually under the regular route and does not refer to the entire irregular authority. We have read and reread the pages following the Commission's announced intention to reach the petitioners' argument. But we cannot see that the Commission ever did. The Commission did speak about duplication of services and such an inquiry is highly relevant to the issues in this case. Indeed, its opinion might be rendered comprehensible by an inference that the Commission deemed the non-duplication of services to be the purpose of the non-severability clause. Perhaps the Commission was trying to say that, and perhaps the Commission's tacit position is that the clause must now be interpreted in light of its original purpose. Our problem is that such an inference for us would be wholly speculative. In adopting it, we would not be reviewing the Commission's rationale, but cutting an analysis of whole cloth and then assessing our own handiwork. Since we are a reviewing court, we feel that the Commission has given us nothing to review and therefore remand this action to the ICC for an express determination of the petitioners' argument.

The applicants and the government argue that the certificates refer only to the highway physically underlying the regular route. They point to *Bowman Transporta-*

*tion, Inc. v. United States,* 308 F.Supp. 1342 (N.D.Ala.1970) (3-Judge Court), for the proposition that the Commission's reading of its certificates in the manner suggested by them is logical and appropriate. The ALJ rejected the applicants' reliance on *Bowman* and found it distinguishable. The Commission never articulated its view of the *Bowman* case nor did it articulate why the ALJ was incorrect in his reading of *Bowman.* Certainly, it might be true that England's operating certificate refers only to the highway underlying the regular authority and we might uphold the Commission were it to adopt such a reading.[4] But we cannot uphold the Commission in this case simply because the ICC has never made such an interpretation. The applicants and the government cannot supply a rationale for a decision that has never been articulated by the Commission.

The present case is remarkably similar to *Humboldt Express, Inc. v. ICC,* 186 U.S. App.D.C. 141, 144, 567 F.2d 1134, 1137 (1977), in which the court said:

In this case, petitioners advance several arguments which call into question the basis of the Commission's actions. The Commission's orders do not reveal whether the agency considered these arguments; if the Commission did in fact consider them, the orders do not reveal the reasons they were rejected. We cannot say that petitioners' questions are so frivolous or so lacking in substance as to permit the Commission to treat them in a perfunctory manner. The inadequate explanation accorded this particular administrative action gives us no opportunity for an intelligent review. Instead, this court is left with a dilemma: we could uncritically approve the agency action, which would amount to a failure to perform properly the duty of a reviewing court. On the other hand, we could search out this matter on our own, which would very probably result in the substi-

4. We, of course, express no opinion on the ultimate holding.

tution of a judicial judgment for an administrative judgment. This dilemma can be avoided only if agencies provide an adequate explanation of the basis for the actions which they take. *Chesapeake Motor Lines v. United States, supra,* 153 F.Supp. 812, at 815–16 (D.C.). While we are mindful of the expertise and experience of the Commission, and while we recognize the need to accord the Commission considerable discretion in transfer applications, we conclude that the agency in this case has not adequately explained the basis for its action.

We adopt this result as our rule. We wish to emphasize that the petitioners' argument is not an obscure point. It is their major argument steadfastly and consistently urged. We believe the Commission owes a duty to the petitioners to address this argument. We therefore remand this action to the ICC for a decision on this issue. Our remand in no way prejudices the petitioners from arguing their other points should a subsequent action arise in this court. We also wish to emphasize that we do not express an opinion regarding the proper reading of the severability certificate.[5]

VACATED AND REMANDED.

---

**5.** The applicants argue that since they have already purchased the operating authority from England, the petitioners are estopped from bringing this action. The Hobbs Act, 28 U.S.C.A. § 2344, provides, in pertinent part, that "[a]ny party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies." The petitioners have sought review within this time period. Jurisdiction is therefore proper in this court, *Chem-Haulers, Inc. v. United States,* 536 F.2d 610, 613–614 (5 Cir. 1976). The unilateral action of the applicants cannot divest this court of jurisdiction to hear this matter. Moreover, the petitioners have done nothing that would allow equitable defenses to be asserted against them.